**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ABU HASHEM W.Q. MALICK | : | |
| AND SHUJAAT Q. MALICK, | : | |
|     Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:13-cv-00669 (VLB) |
| | : | |
| | : | September 30, 2015 |
| J.P. MORGAN CHASE BANK, N.A. | : | |
| AND SAFEGUARD | : | |
| PROPERTIES, LLC, | : | |
|     Defendants. | : | |

<u>**MEMORANDUM OF DECISION GRANTING AND DENYING, IN PART, DEFENDANT J.P. MORGAN CHASE BANK, N.A.'S MOTION FOR SUMMARY JUDGMENT [Dkt. #53] AND MOTION TO STRIKE [Dkt. #61] AND GRANTING DEFENDANT SAFEGUARD PROPERTIES, LLC'S MOTION FOR SUMMARY JUDGMENT [Dkt. #55]**</u>

      Plaintiffs, Abu Hashem W.Q. Malick ("A. Malick") and Shujatt Q. Malick ("S. Malick"), bring federal constitutional and state law claims against Defendants, J.P. Morgan Chase Bank, N.A. ("JPMC") and Safeguard Properties, LLC ("Safeguard").  Currently before the Court are the Defendants' motions for summary judgment.  For the reasons that follow, Defendant Safeguard's motion is GRANTED in its entirety, and Defendant JPMC's motion, as well as its motion to strike, is GRANTED, in part, and DENIED, in part.

I.    <u>Factual Background</u>[1]

Plaintiff Abu Hashem W.Q. Malick (hereinafter "A. Malick") is the owner and current resident of the premises located at 4405 Black Rock Turnpike, Fairfield, CT 06824-7832 (hereinafter "the Premises").  [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 1; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 1]. He acquired the Premises by a deed dated and recorded on January 8, 2007.  [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 1; Dkt. #59, Pls.' Rule 56(a)(2)

---

[1] To determine the undisputed facts in this case, the Court relies upon the parties' Local Rule 56(a) Statements (to the extent they comply with the Federal Rules of Civil Procedure and the Local Rules of this District) and the documentary evidence referenced therein.  The Court also considers the paragraphs appearing under the heading "Disputed Issues of Material Fact" in each of Plaintiffs' Rule 56(a)(2) Statements, but only those paragraphs properly supported by evidence in the record.

Although Plaintiffs are represented in this matter, the Court notes a number of deficiencies in Plaintiffs' filings, not the least of which is Plaintiffs' failure to submit an opposition brief to either of the pending motions for summary judgment, just as Plaintiffs failed to oppose Defendant JPMC's earlier motion to dismiss.  *See* [Dkt. #49].  In addition, the Court notes that, in many instances, Plaintiffs' Rule 56(a)(2) responses fail to specifically admit or deny allegations of fact.  *See, e.g.,* [Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at ¶¶ 9, 18, 32, 35; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at ¶¶ 8, 13-14, 19, 23].  Moreover, a number of Plaintiffs' denials and assertions of fact are unaccompanied by citation to evidence in the record.

Where a party asserts a fact and the opposing party either fails to deny the assertion or, in issuing a denial, the party does not cite to evidence disputing its accuracy, the Court deems such fact admitted.  *See* Local Rule 56(a)(1) ("All material facts set forth in said statement *will be deemed admitted* unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56(a)(2).") (emphasis added); *see also Knight v. Hartford Police Dept.*, No. 3:04-cv-969 (PCD), 2006 WL 1438649, at *4 (D. Conn. May 22, 2006) (deeming as admitted certain statements of fact that the opposing party failed to unambiguously deny and failed to offer a citation to admissible evidence that would support a denial).  Accordingly, the Court GRANTS Defendant JPMC's Motion to Strike insofar as it requests the Court to apply Local Rule 56(a)(1) and accompanying case law in deciding the present motions.  *See* [Dkt. #61 at 3-5].  This motion is otherwise DENIED.

Statement as to JPMC's Mot. at 1].  The Plaintiff, Shujaat Q. Malick (hereinafter "S. Malick") loaned his brother, A. Malick, $335,000 to purchase the premises.  [Dkt. #56-1, A. Malick Dep. 37:11-18, 39:13, Sept. 15, 2014].  There is no evidence in the record that A. Malick gave S. Malick a mortgage to secure his purchase money loan or that such a mortgage was recorded on the land records.  On or about June 30, 2007, A. Malick took out a home improvement loan from Washington Mutual Savings Bank ("WAMU") for $417,000, secured by a mortgage of the Premises.[2]  [*Id.* at 37:12-38:1].  The record in this case is devoid of any documentation representing or otherwise memorializing either loan or any mortgage.

A. Malick used a portion of the bank loan to repay S. Malick approximately $122,000 of the $335,000 he received to purchase the Premises.  [*Id.* at 39:8-10]. He has not repaid the remainder of the loan, and S. Malick maintains that he would still be owed the balance on the loan even if JPMC forecloses on the Premises.  [Dkt. #58-2, S. Malick Dep. 55:21-23, Sept. 15, 2014].  Accordingly, there is no record evidence in this case that S. Malick has either an equitable or legal interest in the Premises.[3]

---

[2] WAMU went into receivership in August 2008, and Defendant JPMC appears to have assumed the loan at issue here.  However, neither party has included the loan agreement and related documentation in the record before the Court.

[3] S. Malick further testified that A. Malick "still owes" him $335,700 "plus interest," that on top of this loan was a subsequent loan for attorneys' fees which S. Malick was "consolidat[ing] with his existing debt," the interest rate on the loan was "8.9 or 9" percent, and that his interest in the Premises was "[m]oney I guess."  [Dkt. #58-2, S. Malick Dep. 17:19-25, 18:8-16, 55:19-20].  In addition, S. Malick affirmed that he never kept any personal property at the Premises, did not live there at any point, and frequently referred to it as his brother's property.  *See* [*id.* at 18:23-19:6, 20:1-2].  Finally, while in his

While the parties do not indicate how many payments, if any, A. Malick has made on the WAMU mortgage loan, they agree that he has not made any payments since August of 2008. [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 3; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 1]. Thus, by early 2009, JPMC commenced foreclosure proceedings against the Premises. [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 6; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 1].[4]

Shortly after JPMC commenced foreclosure proceedings, in November 2008, A. Malick was charged and arrested for violating the terms of his probation and remained incarcerated from November 2008 through May 25, 2012, during which no payments were made on the JPMC mortgage. [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 4; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 1; Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 4; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 1 ]. As a result of his incarceration, A. Malick was away from the Premises for approximately three-and-a-half years.

At the time A. Malick left the Premises, the house was in fine shape; it was "freshly painted, no holes in the walls, no holes in the ceiling . . . everything was working" and the kitchen contained "everything a kitchen usually has, [a]

deposition S. Malick vaguely referred to a written loan agreement with his brother, no such agreement presently appears in the record, nor is there any other evidence as to the existence of a written note or loan agreement, or a mortgage. [*Id.* at 18:3-4].

[4] Citing deposition testimony, Plaintiffs contend that the foreclosure proceedings were dismissed in June, 2014. [Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 16, ¶ 26].

refrigerator, dishwasher. . . ."  [Dkt. #56-1, A. Malick Dep., 64:10-15].  The
Premises also contained many of A. Malick's personal belongings, including
furniture, kitchenware, various professional, gardening, and other equipment, and
a suitcase containing his deceased son's belongings and personal relics.  [*Id.* at
78:19-22, 79:18-80:3; Dkt. #59-1 Ex. A to Pls.' Rule 56(a)(2) Statement as to
JPMC's Mot. at SLFS000235-40].

     While A. Malick was in prison, S. Malick initially checked on the Premises
once or twice a week.  [Dkt. #56-2, S. Malick Dep. 12:23-25, Sept. 15, 2014].[5]  The
Premises were unoccupied during the three-and-a-half years A Malick was
incarcerated.  [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 6; Dkt. #59, Pls.'
Rule 56(a)(2) Statement as to JPMC's Mot. at 1].  When he visited, S. Malick
inspected the outside of the property, but typically did not enter the house.  [Dkt.
#56-2, S. Malick Dep. at 12:19-24, 20:13-17].  S. Malick did not pay utility bills or
otherwise determine if the house was heated.  [Dkt. #58, Def. JPMC's Rule 56(a)(1)
Statement at ¶ 20; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 1].
As a result, within a few months of A. Malick's incarceration, the house was
without electricity and remained in this state until he was released in May 2012.
[Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 22; Dkt. #59, Pls.' Rule 56(a)(2)
Statement as to JPMC's Mot. at 1].  In addition, S. Malick performed virtually no
maintenance work on the property.  He never mowed the lawn, cleaned up leaves,
shoveled snow, or winterized the Premises.  [Dkt. #58, Def. JPMC's Rule 56(a)(1)

---

[5] However, S. Malick admitted that significant periods of time did go by between
  visits, such as when he was traveling internationally from December 2010
  through March 2011.  [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 28; Dkt.
  #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 1].

Statement at ¶¶ 19, 26; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 1, 2, ¶ 26].  When the windows on the property were broken, S. Malick did not repair or cover them.  [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 23; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 2, ¶ 23].[6]  He also allowed several months to elapse between visits inside the Premises.  *See* [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 27; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 1].

By March 2011, S. Malick had ceased regular inspections of the Premises, having only sporadically inspected the exterior for nearly two-and-a-half years, during which period it had been abandoned and become uninhabitable.  [Dkt. #58-2, S. Malick Dep. at 45:19-21; 55:24-56:6, 57:19-58:9].  On March 11, 2011, S. Malick visited the Premises for the first time in approximately three months.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 8; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 2, ¶ 8].  During this visit, S. Malick observed through a window that objects in the house had been moved.  [*Id.*].  S. Malick did not enter the house, and fearing that a break-in had occurred, he called the Fairfield Police Department.  [*Id.*].  However, S. Malick left before the police arrived.  [*Id.*].

---

[6] **The only evidence Plaintiffs offer regarding S. Malick's efforts to maintain the property are two discrete instances, back in 2009, when he "turned off a valve to stop [a] leak" from a burst pipe, and another time, when he "clean[ed] up the kitchen and remove[d] food" from A. Malick's refrigerator.  [Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 7, ¶ 2 (citing deposition testimony); *see also id.* at 2, ¶ 14 ("[S. Malick] did provide some maintenance by cleaning up the premises and removing food from the refrigerator and had turned off a water valve . . . .")].**

S. Malick returned to the Premises two weeks later, on March 25, 2011. [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 9; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 1].  Upon observing two broken windows, that furniture had once again been moved, and, for the first time, that the locks on the front door had been changed, S. Malick again called the Fairfield police.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶¶ 9-10; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 1; Dkt. #56-2, S. Malick Dep. 28:12-20].[7]  The police arrived, inspected the home, interviewed S. Malick, and prepared an incident report.  [Dkt. #56-5, Ex. D to Def. Safeguard's Memo. in Supp. of Mot. for Summ. J. at 2].  According to the report, S. Malick informed the police that "the house has severe interior damage due to a water pipe bursting two years ago."  [*Id.*].  S. Malick also allegedly told police that he had "not physically been in the house in over two years," and he did not know if "anything of value [wa]s missing from the residence."  [*Id.*].  The police officer who inspected the property further noted that "the residence appeared to be [un]inhabitable due to severe water damage made on the interior sheet rock.  Also, there were two rear windows located on the west side of the property that were damaged due to possible forced entry.  Both the exterior and interior of the property w[ere] in very poor condition."  [*Id.*].

While he was at the home on March 25, 2011, S. Malick saw a sign posted on the front of the house.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶

---

[7] **The locks appear to have been changed in December 2010, when Defendant JPMC's property manager winterized the property.  [Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 10, ¶ 11; Dkt. #59-1, Ex. A to Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at SLF000233-34].**

8; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 1].  The sign stated: "THIS PROPERTY IS MANAGED BY CHASE," and provided telephone numbers for both JPMC and "LPS Field Services" in the event "maintenance is needed" or "IN CASE OF EMERGENCY."  [*Id.*; Dkt. #56-4, Ex. C to Def. Safeguard's Memo. in Supp. of Mot. for Summ. J. at 3].  During their inspection, the Fairfield police also noticed this sign, called the phone number listed on it, and "confirmed that Chase Bank (LPS) is managing the [Premises]."  [Dkt. #56-5, Ex. D to Def. Safeguard's Memo. in Supp. of Mot. for Summ. J. at 2].

LPS Field Services, LLC, now known as ServiceLink Field Services, LLC ("LPS"), like Defendant Safeguard, is in the business of inspecting, maintaining and overseeing homes in foreclosure or default on behalf of lenders.  [Dkt. #56-7, Meyer Aff. at ¶ 11; Dkt. #56-11, Ex. D to Meyer Aff. at ¶ 3].  The evidence submitted by both parties indicates that from roughly July 29, 2009, around the same time S. Malick ceased regular inspections of the Premises, LPS managed the Premises on behalf of Defendant JPMC and continued to manage them through early July 2012.  *See* [Dkt. #58-3, Ex. C to Def. JPMC's Rule 56(a)(1) Statement at SP000068-75; Dkt. #59-1, Exs. A through H to Pls.' Rule 56(A)(2) Statement as to JPMC's Mot.; Dkt. #56-7, Meyer Aff. at ¶¶ 6, 12; Dkt. #56-8, Ex. A to Meyer Aff. at 1].  LPS increased the frequency and extent of its management after November 29, 2010, when it concluded that the Premises were unoccupied.  *See* [Dkt. #59-1, Ex. A to Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at SLFS000134; Dkt. #56-7, Meyer Aff. at ¶ 12].

From December 2010 through June 2012, LPS inspected the home at least once (and often multiple times) every month, taking extensive photos of the interior and exterior of the Premises, and preparing detailed reports regarding the presence of occupants and personal items, whether the property was adequately secured upon arrival, the condition of the exterior and interior of the home, including the presence of appliances and damage to rooms, floors, and plumbing, whether or not the home was receiving utilities, and maintenance needs, such as winterizing, debris removal, changing locks, replacement of glass, and lawn maintenance. *See* [Dkt. #58-3, Ex. C to Def. JPMC's Rule 56(a)(1) Statement at SP000068-75; Dkt. #58-5, Ex. E to Def. JPMC's Rule 56(a)(1) Statement at SLFS000398-400; Dkt. #59, Exs. A-G to Pls.' Rule 56(A)(2) as to JPMC's Mot. at SLFS000133-36, SLFS000141-42, SLFS000145-56, SLFS000159-60, SLFS000175, SLFS000177, SLFS000233-55, SLFS000321-24, SLFS 326-29, SLFS000464-65, SLFS000468]. LPS hired contractors to perform maintenance tasks, such as winterizing the home, changing the locks, and for lawn care. *See* [Dkt. #59, Exs. A-D to Pls.' Rule 56(A)(2) as to JPMC's Mot. at SLFS000233-34, SLFS000624-29, SLFS000630, SLFS000632; Dkt. #58-3, Ex. C to Def. JPMC's Rule 56(a)(1) Statement at SP000068-75].

Defendant Safeguard is a "separate and distinct" entity from LPS, and "was not, and is not now, affiliated with, or associated with LPS."  [Dkt. #56-7, Meyer Aff. at ¶ 11].  Accordingly, prior to July 2012, Defendant Safeguard did not

perform any work at the Premises, nor did any of its employees, contractors, or agents visit the Premises.  [*Id.* at ¶ 8].[8]

Following the March 25, 2011 incident, S. Malick changed the locks on the Premises, but did not repair the broken windows, or do anything else to secure it or make it appear occupied.   [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 11; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 1]. Approximately two weeks later, on April 9, 2011, the Fairfield Police returned to the home, after receiving a call from A. Malick's neighbor.  *See* [Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 5, ¶ 5; Dkt. #58-4, S. Malick. Dep. Vol. II 44:15-19].  Upon arrival, the police found "the left garage door of the

---

[8] While Plaintiffs repeatedly deny that "Safeguard had no involvement in [the] protection of the Premises prior to July 2012," "LPS has no connection to Safeguard," and "Safeguard is not affiliated with or associated with LPS," Plaintiffs do not cite to any evidence in support of these assertions.  [Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 2-3, ¶¶ 13-14, 18-20].  At most, Plaintiffs cite generally to Defendant Safeguard's 80-page Rule 26(a)(1) disclosure for the proposition that Safeguard's records "did not contain any differentiation for records prior to July, 2012 or indicate that they had come from an independent and separate entity."  [*Id.* at 7, ¶ 10].  According to Plaintiffs, this supports A. Malick's "belief that [Safeguard] had been responsible for maintaining property security throughout th[e] entire period." [*Id.*].  Upon review, Plaintiffs appear to be referring to the final seven pages of the disclosure, which contain a timeline of inspections performed on the property from July 29, 2009 through June 27, 2012.  *See* [Dkt. #58-3, Ex. C to Def. JPMC's Rule 56(a)(1) Statement at SP000068-75].  However, Plaintiffs' conclusion is incorrect.  In addition to referring to LPS throughout, the final entry of the timeline plainly states: "7/30/12 *Transferred to Safeguard Properties*[.]  Property has been reported as Occupied."  [*Id.* at SP000075 (emphasis added)].  Indeed, as the Meyer Affidavit submitted by Defendant Safeguard makes clear, this timeline contains "historical information concerning LPS's service on the Premises" that Safeguard received from *JPMC*. [Dkt. #56-7, Meyer Aff. at ¶ 13].  Plaintiffs offer no evidence to rebut this contention, and thus, have not proffered any evidence that Defendant Safeguard had any involvement in the management or maintenance of the Premises prior to July 2012.

detached garage was wide open," there were "no signs of foul play," and "the house was in deplorable condition and appeared to be uninhabited." [Dkt. #58-4, S. Malick. Dep. Vol. II 44:24-45:2]. The police further noted that the "rear door" to the Premises was "unsecured," and upon inspecting the interior of the Premises, the police concluded that "someone may have been frequenting the residence for short stays." [*Id.* at 45:3-6]. There is no evidence to suggest that S. Malick secured either of the doors, nor is there any evidence that S. Malick contacted LPS or JPMC to inform them of the condition and vulnerability of the Premises. *See* [Dkt. #58-2, S. Malick Dep. 25:22-26:2].

On or around April 20, 2011, LPS conducted an interior and exterior inspection of the home. [Dkt. #56-6, Ex. E to Def. Safeguard's Memo. in Supp. of Mot. for Summ. J. at SLFS000145]. The inspection report identified three items in the home that were "not secure," the front door, back door, and a window. [*Id.* at SLFS000145-46]. The report further noted that "someone has been inside" and that they "broke locksets–took fridge, dishwasher, beds, dressers." [*Id.* at SLFS000148]. The inspector further noted "broken windows/locks" and concluded that the house was "not secure against intruders." [*Id.*].[9] Inspectors also did not find any personal property on the Premises. [*Id.* at SLFS000145]. They did, however, note the presence of a stove, range, water tank, and furnace.

---

[9] Plaintiffs appear to dispute the accuracy of this report in light of a summary inspection report which states "No Damage" next to the "Inspection" dated "4/20/2011." [Dkt. #56-6, Ex. E. Def. Safeguard's Memo. in Supp. of Mot. for Summ. J. at SLF000399; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 6, ¶ 58]. However, the report does note that the house was "Unsecure." [Dkt. #56-6, Ex. E. Def. Safeguard's Memo. in Supp. of Mot. for Summ. J. at SLF000399].

[*Id.* at SLFS000147].  During this visit, LPS inspectors changed the locks on the home, placed "[b]oard/screens" on the Premises, but did not repair any glass. [*Id.* at SLFS000146].

On May 15, 2011, LPS inspectors returned to the Premises.  *See* [Dkt. #59-1, Ex. E to Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at SLFS000252-55, SLFS 000464-65].  The photos taken during this visit display extensive damage to the Premises, including exposed wiring and plumbing and large amounts of debris strewn about the house.  [*Id.* at SLFS000253-54].   However, some appliances and fixtures, including an oven and sink in the kitchen, and a toilet and sink in a bathroom, are visible. [*Id.* at SLFS000253-54].  Upon departure, inspectors deemed the Premises secure.  [*Id.* at SLFS000252].  Later that month, on May 31, 2011, LPS conducted another inspection.  *See* [*id.* at SLFS000149].  LPS estimated that the Premises had sustained "$10,000" in damages, found that it was vacant and secure, and that there was no personal property on site.  [*Id.*].

The next two months, June and July 2011, LPS visited the Premises several times.  [Dkt. #56-6, Ex. E. to Def. Safeguard's Memo. in Supp. of Mot. for Summ. J. at SLF000399].  On June 6, 2011, an inspection noted damage due to owner neglect, but found the house secure.  [Dkt. #59-1, Ex. E to Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at SLFS000150].  During this visit, LPS inspectors replaced broken glass, cut the grass, and placed boards or screens on the Premises.  [*Id.*].  They did not, however, change the locks.  [*Id.*].

Three days later, on June 9, 2011, LPS employees undertook preservation measures and estimated that the Premises had suffered approximately

"$14[,]000" in damages to its interior due, at least in part, to vandalism.  [Ex. E. Def. Safeguard's Memo. in Supp. of Mot. for Summ. J. at SLF000399].  They also noted that copper and baseboard were missing.  [*Id.*].  On June 22, 2011, LPS inspectors returned, noted damage to the gutters and windows of the Premises and estimated damages totaling $15,000.  [Dkt. #59-1, Ex. F to Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at SLFS000152].  It does not appear that LPS undertook any additional maintenance or securing of the Premises during this inspection.  [*Id.*].  On July 2, 2011, LPS performed another inspection.  [*Id.*].  The inspection report concluded that the Premises had "been ransacked, all appliances stolen, piping stolen, holes in walls and ceiling."  [*Id.* at SLFS000155].

Accordingly, the parties appear to agree that the damage to the Premises and theft of A. Malick's personal property at issue in this case occurred no later than July 2011.  *See* [Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 10, ¶ 11 ("The records produced by Safeguard indicated that . . . [s]ignificant damages were noted in inspections in June and July, 2011.").[10]  Defendant JPMC contends, and Plaintiffs do not deny, that during the period of A. Malick's incarceration, numerous individuals were aware of the nature and extent of his absence from the Premises, including friends, relatives, members of his religious community, and law enforcement.  [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 32; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 3, ¶ 32].  The Premises are located close to the Merritt Parkway, a major route through the state of Connecticut, and on Route 59, a major route that runs through Easton,

---

[10] Plaintiffs do not challenge the accuracy of the June and July 2011 inspection reports, but instead affirmatively rely upon them.  *See, e.g.,* [Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 12, ¶ 17].

Connecticut.  [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 29; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 1].  The Premises are also within walking distance, approximately four or five houses away, from a motel.  [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶¶ 30-31; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 1].

During the period of May through August 2011, the same time the extensive damage and theft was discovered, LPS reviewed several bids, totaling $19,145, to perform work on the Premises.  [Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 13, ¶ 20; Dkt. #59-1, Ex. I to Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at SLFS00049-50, SLFS000053-59, SLFS000061-63, SLFS000067, SLFS000069].  By this point, Defendant JPMC had already spent approximately $3,065.75, in addition to its fee arrangement with LPS, on services to maintain the Premises.  [Dkt. #59-1, Ex. E to Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at SLFS000464].  The most expensive entries on each of these bids were for removing internal debris and property and installing copper piping.  [Dkt. #59-1, Ex. I to Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at SLFS00049-50, SLFS000053-59, SLFS000061-63, SLFS000067, SLFS000069].  The bids were ultimately cancelled with multiple notations that the work was "not required." [Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 13, ¶ 20].

On October 20, 2011, S. Malick returned to the Premises and called the police when he noticed that the back door and two windows were open.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 15; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 1; Dkt. #58, Def. JPMC's Rule 56(a)(1)

14

Statement at ¶ 35; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 3, ¶ 35].[11]  On the back door, S. Malick noticed a lockbox.  [Dkt. #58-2, S. Malick Dep. 55:6-18].  He entered the home with the police through the open back door, and the parties first discovered the extent of the damage to the home itself and the theft of appliances, fixtures, and A. Malick's personal property, which the parties agree occurred three to four months earlier, in June or July 2011.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 15; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 1; Dkt. #56-2, S. Malick Dep. 31:3-8].

After surveying the damage, S. Malick locked the door and left the Premises.  [Dkt. #58-2, S. Malick Dep. 33:18-23].  He did not change the locks at that time or at any time in the future.  [*Id*. at 33:22-34:2].  To access the interior of the home, S. Malick (and A. Malick upon his return) used an open window.  [*Id*. at 34:3-6].

A. Malick was released from prison on May 25, 2012, and returned to the Premises.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 17; Dkt. #60 Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 1, 11, ¶ 21].  Upon his return, A. Malick found that the locks had been changed, but his brother, S. Malick, entered the property through an open window and then opened the front door, allowing A. Malick to enter the home.  *See* [Dkt. #56-1, A. Malick Dep. 72:1-9].  That same day, A. Malick had the locks put on by LPS changed.  [*Id*. at 72:23-

---

[11] S. Malick did not attempt to enter the home between the March 25, 2011 and October 20, 2011 visits.  *See* [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶¶ 34-35; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 3, ¶¶ 34-35 (describing March 25, 2011 visit and stating that "[f]ollowing this incident, [S. Malick] . . . returned in approximately October of 2011")].  Nor did he check to see if the locks had been changed a second time.  *See* [Dkt. #56-2, S. Malick Dep. 29:20-23].

73:5].  The locks remained in Plaintiffs' control thereafter.  Upon entering the home, A. Malick discovered it was uninhabitable and that a suitcase containing the clothes and personal effects of his deceased son had been taken from the Premises.  [*Id*.].

On or around July 10, 2012, Defendant Safeguard received its first order to inspect the Premises.  [Dkt. #56-7 Meyer Aff. at ¶ 6; Dkt. #56-8, Ex. A to Meyer Aff. at SP000052].  On July 30, 2012, Safeguard conducted its first inspection.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 19; Dkt. #56-8, Ex. A to Meyer Aff. at 1; Dkt. #56-9, Ex. B to Meyer Aff. at SP000001].  After speaking with a neighbor, the Safeguard inspector determined that "the property is seasonally vacant" but at that time, it was "occupied."  [Dkt. #56-9, Ex. B to Meyer Aff. at SP000001].  A few weeks later, on August 19, 2012, Safeguard performed another inspection.  [Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 11-12, ¶ 23; Dkt. #56-9, Ex. B to Meyer Aff. at SP000004-5].  During the inspection, Safeguard placed a sticker on the front door of the Premises which stated that the property was found to be "vacant/abandoned."  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 21; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 11-12, ¶¶ 21, 23; Dkt. #56-12, Ex. G to Def. Safeguard's Memo. in Supp. of Mot. for Summ. J. at 2].  The sticker also included a Safeguard phone number to call in the event the property was not vacant.  [*Id*.].

The following day, August 20, 2012, A. Malick called the Safeguard phone number and advised Safeguard that he was occupying the premises.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 21; Dkt. #60, Pls.' Rule 56(a)(2)

Statement as to Safeguard's Mot. at 11-12, ¶ 23].  Nine days later, on August 29, 2012, A. Malick sent a formal letter to Safeguard, reiterating this fact.  *See* [Dkt. #56-9, Ex. B to Meyer Aff. at SP000010-11].  Between July 30, 2012 and March 9, 2013, Safeguard conducted eight additional inspections of the exterior of the home.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 19; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 3, ¶ 19].  Each time, Safeguard's contractor reported that the Premises were occupied.  [*Id.*].  On April 11, 2013, Safeguard again determined that the Premises were vacant.  [*Id.*].  Prior to this date, Safeguard did not attempt to access the interior of the Premises.  [*Id.*].

On two occasions almost a year later, June 9 and June 23, 2013, A. Malick was contacted by Safeguard contractors.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 22; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 11, ¶ 22; Dkt. #56-9, Ex. B to Meyer Aff. at SP000033, SP000042].  The first time, on June 9, 2011, the Safeguard inspector came to the Premises, informed A. Malick that he planned to inspect the Premises, and A. Malick reported that they were occupied and ordered him to leave, which he did.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶¶ 22-23; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 11, ¶ 22].  Later that month, on June 23, 2013, two Safeguard employees returned to the Premises with tools and stated that they had come to change the locks because they had understood the Premises were vacant.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 23; Dkt. #56-1, A. Malick Dep. 71:1-4].  A. Malick informed them that he lived there, ordered them off the Premises, and they left without changing the locks.  [Dkt.

#57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 23; Dkt. #56-1, A. Malick Dep. 71:4-8].  On a third occasion, Safeguard employees placed another vacancy sticker on the Premises when A. Malick was away.  [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 52; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 5, ¶ 52; Dkt. #56-1, A. Malick Dep. 119:12-13].  A. Malick claims that these three occurrences left him "emotionally distraught" because he could not be certain that these events would not occur again or that he would retain control of the Premises if he left it for any length of time.  [Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 5, ¶ 52].  However, Plaintiffs do not contend that the Safeguard employees damaged their real or personal property during any of these inspections, or that they ever succeeded in changing the locks.  In addition, A. Malick engaged in international travel on three occasions after he had confronted the Safeguard employees.  [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 53; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 5, ¶ 53].

## II.   Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.*

(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).  In addition, determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment, as such are within the sole province of the jury.  *Hayes v. New York City Dep't of Corr.,* 84 F. 3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No. 3:03-cv-481 (MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (citing and quoting *Gottlieb v. Cnty. of Orange,* 84 F.3d 511, 518 (2d Cir. 1996)); *Martinez v. State of Connecticut,* No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions

without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

**III.**   <u>Analysis</u>

**A.**   <u>Without a Legal or Equitable Interest in the Premises S. Malick Lacks Standing to Pursue His Claims</u>

In its memorandum of decision on Defendant JPMC's motion to dismiss, the Court noted that, while sufficient to avoid dismissal, the allegations surrounding "S. Malick's interest in the Premises [are], at best murky." [Dkt. #66 at 9 n. 3]. At the close of discovery, it is clear that S. Malick never received any title to the Premises.

According to his testimony, the loan he provided his brother, A. Malick, was not secured with a mortgage or other interest in the Premises, but instead, with a promise of repayment. Specifically, S. Malick testified that (i) even if the bank were to take the Premises, A. Malick would still owe him the balance on the loan, (ii) on top of this loan was a subsequent loan for attorneys' fees which S. Malick was "consolidat[ing] with his existing debt," (iii) the interest rate on the combined loan was "8.9 or 9" percent, and (iv) his interest in the Premises was "[m]oney I guess." [Dkt. #58-2, S. Malick Dep. 17:19-25, 18:8-16, 55:19-23]. That the Premises were an asset A. Malick could (and did) use as a vehicle for repayment of the loan does not mean that S. Malick received an interest in them. Indeed, aside from a stray veiled reference to a contract with his brother, there is no evidence of *any* enforceable loan agreement between the brothers, and the fact that S. Malick could not definitively state the interest rate on the loan(s) strongly suggests that there is no written note. *See* [*id.* at 18:14-16].

In addition, S. Malick affirmed that he never kept any personal property at the Premises, did not live there at any point, and he frequently referred to them as belonging solely to his brother.  *See* [*id.* at 18:23-19:6, 20:1-2].

Based on these undisputed facts, it cannot be said that the damage to the Premises caused S. Malick to suffer an injury-in-fact sufficient to create Article III standing; that is, an injury that is "distinct and palpable," but rather, he suffered at most " 'abstract' or 'conjectural' or 'hypothetical'" harm.  *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 330 (2d Cir. 1997) (citations and quotation omitted).

Accordingly, all claims brought on behalf of Plaintiff S. Malick are DISMISSED.

**B.    All Claims Against Defendant Safeguard Must Be Dismissed As Safeguard Did Not Become Involved in the Premises Until After the Injuries to Plaintiffs' Real and Personal Property**

As an initial matter, the undisputed evidence establishes that Defendant Safeguard first became involved in the management of the Premises in July 2012. *See* [Dkt. #56-7 Meyer Aff. at ¶ 6; Dkt. #56-8, Ex. A to Meyer Aff. at SP000052].  It is also undisputed that the damage to the Premises and the theft of A. Malick's personal property occurred over a year earlier.  *See* [Dkt. #56-5, Ex. D to Def. Safeguard's Memo. in Supp. of Mot. for Summ. J. at 2 (March 25, 2011 police report stating that "the residence appeared to be [un]inhabitable due to severe water damage" and recording statements from S. Malick that the "severe interior damage" was "due to a water pipe bursting two years ago"); Dkt. #56-6, Ex. E to Def. Safeguard's Memo. in Supp. of Mot. for Summ. J. at SLFS000148 (April 20,

2011 inspection report by LPS noting that "someone has been inside" and that they "took fridge, dishwasher, beds, dressers"); *id.* at SLFS00155 (July 2, 2011 LPS report finding that the Premises had "been ransacked, all appliances stolen, piping stolen, holes in walls and ceiling"); Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 15; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 1 (On October 20, 2011 S. Malick checked on the Premises and discovered appliances, fixtures, and A. Malick's personal effects had been stolen)].

Accordingly, Defendant Safeguard cannot be liable for any of this property damage or theft, and any claims against Safeguard premised on such damage must be dismissed.  *See* [Dkt. #48 Am. Compl. at ¶¶ 35 (conversion claim based on "harm to the real and personal property of [A. Malick] and to the economic interest of [S. Malick]"), 38 (negligence claim based on "damage, waste, theft and loss" of "the property and its valuable contents"), 40 (statutory theft or receipt of stolen "personal property . . . of the Plaintiff [A. Malick]"), 42 (infliction of emotional distress through loss of suitcase containing belongings of A. Malick's deceased son), 45 (alleging "vandalism and the destruction of property at the Premises")].

The only conduct applicable to Safeguard post-dates Plaintiff A. Malick's return to the Premises in May 2012.  Thereafter, the parties agree that on three occasions, Safeguard employees came to the Premises despite having been previously informed that A. Malick was occupying it.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶ 22; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 11, ¶ 22; Dkt. #56-9, Ex. B to Meyer Aff. at SP000033,

SP000042; Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 52; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 5, ¶ 52; Dkt. #56-1, A. Malick Dep. 119:12-13].  On one occasion, A. Malick was not at the Premises, and on the other two, the Safeguard employees left without incident when he identified himself as the occupant of the Premises and ordered them off the property.  [Dkt. #57, Def. Safeguard's Rule 56(a)(1) Statement at ¶¶ 22-23; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 11, ¶ 22; Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 52; Dkt. #59 Pls. Rule 56(a)(2) Statement as to JPMC's Mot. at 5, ¶ 52; Dkt. #56-1, A. Malick Dep. 70:22-71:22, 119:12-13].   As a result of these encounters, A. Malick claims that he suffered emotional distress.  [Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 5, ¶ 52].

Under these facts, Plaintiffs' remaining claims against Defendant Safeguard fail as a matter of law.  For instance, Plaintiffs' CUTPA claim must fail because Plaintiffs cannot show that Defendant Safeguard caused Plaintiffs to suffer an ascertainable loss.  *See Di Teresi v. Stamford Health Sys., Inc.*, 149 Conn. App. 502, 512, 88 A.3d 1280, 1285 (Conn. App. 2014) (concluding that a "claim of emotional distress does not constitute an ascertainable loss of money or property for purposes of CUTPA").

Plaintiffs' entry and detainer claim similarly fails because the Safeguard employees did not use force to enter the Premises, did not hold or detain the Premises, did not cause damage to any real or personal property upon entry, and did not require Plaintiffs to cause damage to the Premises or commit a breach of

the peace in order to regain possession of the Premises.  *See* Conn. Gen. Stat. §

47a-43(a)(1)-(4).

Finally, Plaintiffs' trespass claim must be dismissed for two reasons.  First,

they have not shown that the Safeguard employees' intrusions affected their

possessory interests in the Premises.  *Abington Ltd. P'ship v. Talcott Mountain*

*Sci. Ctr. for Student Involvement, Inc.*, 43 Conn. Supp. 424 (Conn. Super. Ct. 1994)

(dismissing trespass claim based on defendant's use of a power line easement to

supply electricity where plaintiff failed to show "that the passage of the electricity

affect[ed] its possessory interest").  Second, they have not put forth any evidence

that these intrusions caused direct injury to the Premises.  *Rovaldi v.*

*Courtemanche*, No. 3:04-cv-1722 (MRK), 2005 WL 3455131, at *3 (D. Conn. Dec. 16,

2005) (granting summary judgment on trespass claim where plaintiff failed to

"demonstrate that the property trespassed upon suffered 'direct injury'")

(citations omitted).

Having been unable to raise any triable issues of fact on any of their

causes of action, Plaintiffs' Complaint is DISMISSED as to Defendant Safeguard.

**B.**     **Plaintiffs Fail to Raise a Triable Issue of Material Fact in Support of Counts III, IV, VI, and XIII of the Second Amended Complaint**

The undisputed record in this case forecloses each of these claims against

Defendant JPMC.

**1.  Plaintiffs' Claim of Forcible Entry and Detainer Fails**

Count III of Plaintiffs' Second Amended Complaint brings a forcible entry

and detainer claim, pursuant to Conn. Gen. Stat. § 47a-43, but fails to identify

under which of the four statutory bases this claim is brought.  *See* [Dkt. #48,

Second Am. Compl. at ¶ 36].  Pursuant to this statute:

> When any person (1) makes forcible entry into any land, tenement or dwelling unit and with a strong hand detains the same or (2) having made a peaceable entry, without the consent of the actual possessor, holds and detains the same with force and strong hand or (3) enters into any land, tenement or dwelling unit and causes damage to the premises or damage to or removal of or detention of the personal property of the possessor, or (4) when the party put out of possession would be required to cause damage to the premises or commit a breach of the peace in order to regain possession, the party thus ejected, held out of possession, or suffering damage may exhibit his complaint to any judge of the Superior Court.

Conn. Gen. Stat. § 47a-43(a)(1)-(4).

Plaintiffs' claim is rooted in LPS' changing of the locks on the property and

Defendant JPMC's other efforts to manage the Premises.  *See* [Dkt. #48, Second

Am. Compl. at ¶¶ 34-36].  However, Defendant JPMC is entitled to summary

judgment.

First, and alone sufficient to preclude such a claim, is that neither Plaintiff

was in actual possession of the Premises at the time LPS changed the locks.  *See*

*Quinto v. Boccanfusco*, 139 Conn. App. 129, 134, 54 A.3d 1069, 1073 (Conn. App.

2012) ("A plaintiff suing under the forcible entry and detainer statute must prove

his *actual* possession of the land or property from which he claims to have been

dispossessed.") (quotation and citation omitted) (emphasis in original).   A.

Malick was in prison and away from the Premises until May 25, 2012, and thus did

not have actual possession of the Premises when the locks were changed.  [Dkt.

#58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 4; Dkt. #59, Pls.' Rule 56(a)(2)

Statement as to JPMC's Mot. at 1; Dkt. #57, Def. Safeguard's Rule 56(a)(1)

Statement at ¶ 4; Dkt. #60, Pls.' Rule 56(a)(2) Statement as to Safeguard's Mot. at 1 ]. That A. Malick held equitable title to the home does not establish actual possession for the purposes of the forcible entry and detainer statute. *See Wilcox v. Ferraina*, 100 Conn. App. 541, 551-52, 920 A.2d 316, 323-24 (Conn. App. 2007) ("[A]ctual possession, rather than right to possession, must remain the ultimate inquiry"); *see also Sullivan v. Delisa*, 101 Conn. App. 605, 611, 923 A.2d 760, 766 (Conn. App. 2007) ("[T]he statute designedly excludes the examination and decision of the question of title.") (quoting *Bliss v. Bange*, 6 Conn. 78, 80 (Conn. 1826)). In addition, that the changed locks initially denied A. Malick entry to the Premises upon his return on May 25, 2012 does not alter this conclusion, because actual possession is determined as of the time LPS employees entered the Premises. *See* [Dkt. #56-1, A. Malick Dep. 72:1-9, 72:23-73:5]; *Balf Co. v. Exxon Corp.*, 682 F. Supp. 735, 738 (D. Conn. 1988) (dismissing forcible entry and detainer claim upon concluding that "[p]laintiffs cannot legally be deemed to have been in actual possession of the real property *at the time of defendant's entry*") (emphasis added).

S. Malick lacked actual possession because he did not "exercise[] the dominion and control that owners of like property usually exercise." *Quinto*, 139 Conn. App. at 134, 54 A.3d at 1073. S. Malick performed virtually no maintenance work on the home, other than stopping by periodically to inspect the exterior and entering the home, at most, once every few months. [Dkt. #56-2, S. Malick Dep. at 12:19-24, 20:13-17]. He did not pay utility bills or otherwise determine if the house was heated, which caused the home to be without electricity and heat for a

period of years.  [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶¶ 20, 22; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 1].  He never mowed the lawn, cleaned up leaves, shoveled snow, or winterized the Premises.  [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶¶ 19, 26; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 1, 2, ¶ 26].  When the windows on the property were broken, S. Malick did not repair or cover them.  [Dkt. #58, Def. JPMC's Rule 56(a)(1) Statement at ¶ 23; Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 2, ¶ 23].  As a result, S. Malick allowed the home to fall into total disrepair, as evidenced by the severe internal damage caused by a burst pipe, and the photos taken by LPS, which displayed exposed wiring and plumbing, damage to the exterior and interior of the Premises, and large amounts of debris strewn about the house.  [Dkt. #56-5, Ex. D to Def. Safeguard's Memo. in Supp. of Mot. for Summ. J. at 2; Dkt. #59-1, Ex. E to Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at SLFS000252-55, SLFS 000464-65]].  Collectively, the damage and neglect S. Malick permitted is inconsistent with "indicia of the exercise of dominion and control sufficient for . . . a finding of actual possession."  *Quinto*, 139 Conn. App. at 135, 54 A.3d at 1073 (affirming trial court's dismissal of entry and detainer claim where court found "claims of actual possession to be not credible considering the deplorable condition of the premises" which included the presence of "debris, useless equipment, broken furniture and junk automobiles").

Second, neither the changing of the locks on the property nor the placing of notices on the Premises stating that JPMC and LPS were managing the property satisfies the force or strong hand requirement under the first two prongs

27

of the forcible entry and detainer statute. *See* Conn. Gen. Stat. § 47a-43(a)(1)-(2); *Cohen v. Tziolis*, No. CV 116020149S, 2012 WL 695498, at *16 (Conn. Super. Ct. Feb. 9, 2012) ("To make a detainer forcible or one with a strong hand, a plaintiff must prove that the detainer was accomplished by some circumstance of actual or threatened violence calculated to intimidate the plaintiff and to deter him from asserting or maintaining his rights.") (citing *Hartford Realization Co. v. Travelers Ins. Co.*, 117 Conn. 218, 225 167 A. 728, 730-31 (Conn. 1933)); *Halley v. Village Park Realty Co.*, No. CV 010451467S, 2001 WL 1744693, at *3 (Conn. Super. Ct. Dec. 31, 2001) (noting that a "threat[] to have [plaintiff] arrested if he returned and changing the locks . . . may not be sufficient to support claims under § 47a-43(a)(1) and (2) . . . ."). Here, Plaintiffs raise no "actual or threatened violence" on the parts of either Defendant JPMC or LPS, nor do they show any efforts by either of these parties to intimidate or deter Plaintiffs from asserting their rights to enter the Premises. At no time did either JPMC or LPS refuse a request from Plaintiffs to enter the Premises or to remove or not put on new locks. Indeed, nothing in the record indicates that, prior to May 25, 2012, LPS or JPMC even knew that either Plaintiff sought access to the Premises, as Plaintiffs did not attempt to communicate with either entity. *See* [Dkt. #58-2, S. Malick Dep. 25:22-26:2].[12]

Accordingly, summary judgment is GRANTED as to Count III, and this Count is hereby DISMISSED.

---

[12] The Court further notes, but does not rely on the fact, that Plaintiffs' forcible entry and detainer claim is time-barred, as LPS changed the locks for the final time in 2011 and the Complaint was filed on May 10, 2013. *See* [Dkt. #1]; *Karantonis v. Town of East Hartford*, 71 Conn. App. 859, 864-65, 804 A.2d 861, 864-65 (Conn. App. 2002) (holding that six-month statute of limitations begins to run when defendant last changes the locks).

**2.  Plaintiffs' Civil Trespass Claim Fails**

Count IV of the Second Amended Complaint brings a claim for civil trespass.  *See* [Dkt. #48, Second Am. Compl. at ¶ 37].  To make out a claim for civil trespass, Plaintiffs must show: (1) ownership or possessory interest in the Premises, (2) invasion, intrusion or entry by the Defendant affecting their exclusive possessory interest, (3) done intentionally, and (4) causing direct injury.  *See Bristol v. Tilcon Minerals, Inc.*, 284 Conn. 55, 87, 931 A.2d 237, 258 (Conn. 2007).  "A trespass on real estate is the doing of a *direct injury to property by force.*"  *Lake Garda Imp. Ass'n v. Battistoni*, 160 Conn. 503, 516-17, 280 A.2d 877, 883-84 (Conn. 1971) (emphasis added).

Here, even assuming Plaintiffs' version of the events, LPS's intrusion, invasion, or entry onto the Premises did not directly cause the injuries Plaintiffs advance.  At most, Plaintiffs contend that LPS's management of the Premises negligently permitted damage and theft that was caused by some other party at some later point.  [Dkt. #59, Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at 3, ¶¶ 35-36; 4, ¶¶ 43, 47; 5, ¶ 54].  Absent direct injury to the Premises from the trespass itself, Plaintiffs' claim fails.  *See Atuahene v. City of Hartford*, 491 F. Supp. 2d 278, 282 (D. Conn. 2007) (granting summary judgment on trespass claim where the damages claimed did "not arise from any trespass" but from subsequent "seizure and sale of various fixtures and items of personal property from [the premises]"); *Ru-Jack Dev. v. Philson, Inc.*, No. CV 990153848S, 2004 WL 17301715, at *4 (Conn. Super. Ct. Jul. 7, 2004) (dismissing trespass claim where

the trespass, in the form of debris allegedly placed on plaintiff's property by defendant, did not cause direct injury).

Further, there are no facts creating a genuine dispute that any invasion on the part of LPS or JPMC affected the Malicks' possessory interest.  First, as stated above, there is no evidence that S. Malick had a possessory or other interest in the Premises.  Second, A. Malick was not residing at or exercising a possessory interest in the Premises during the period LPS managed the Premises.  Third, and most persuasively, the Premises were unoccupied, had no utilities, had burst water pipes and broken windows, had untended grounds, was not being maintained, and thus, appeared for all intents and purposes to have abandoned by both A. Malick and S. Malick.

Accordingly, summary judgment is GRANTED as to Count IV, and this Count is hereby DISMISSED.

### 4.  Plaintiffs' Civil Theft Claim Fails

Count VI of the Second Amended Complaint alleges that Defendant JPMC committed civil theft in one of two ways: Defendant JPMC "knowingly seized personal property without lawful authority" or it "knowingly received and concealed stolen property of the Plaintiff [A. Malick]."  [Dkt. #48, Second Am. Compl. at ¶ 39].

To establish a claim of civil theft, Plaintiffs must prove "the same  . . . elements required to prove larceny."  *Sullivan*, 101 Conn. App. 605, 619-20, 923 A.2d 760, 771 (Conn. App. 2007).  "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third

person, he wrongfully take, obtains or withholds such property from an owner . . . it must be shown that (1) there was an intent to do the act complained of, (2) the act was done wrongfully, and (3) the act was committed against the owner."  *Id.* at 620 (citation and quotations omitted).  Plaintiffs' claim of civil theft fails for at least two reasons.

First, the record is devoid of any evidence that Defendant JPMC ever took or came into possession of A. Malick's personal belongings.  Plaintiffs do not allege, nor does the evidence indicate, that any employees of JPMC ever visited the Premises.  There is no evidence indicating that employees of LPS took any of Plaintiff's personal property, let alone, that they turned over any property they took to JPMC.  Accordingly, the record does not support either of Plaintiffs' civil theft theories.

Second, while LPS did change the locks on the Premises, which could have had the effect of withholding from Plaintiffs A. Malick's personal property, there is nothing in the record to suggest, nor do Plaintiffs appear to presently contend, that LPS changed the locks "with intent to deprive [A. Malick] of his . . . property." *Torres v. Kershner*, Nos. CV 0540007041S, CV 085023624S, 2010 WL 5573744, at *13 (Conn. Super. Ct. Dec. 13, 2010) (stating that to prove larceny it must be shown that "the defendant acted with the subjective desire or knowledge that his actions constituted stealing") (quoting *State v. Varszegi*, 33 Conn. App. 368, 372-73, 635 A.2d 816, 818 (Conn. App. 1993)).  As property manager, and upon determining that the Premises themselves were unsecure, LPS clearly changed the locks for the purpose of protecting it from further damage and loss.

31

Accordingly, summary judgment is GRANTED as to Count VI, and this Count is hereby DISMISSED.

5.     **Plaintiffs' Negligent Hiring Claim Fails**

Count XIII seeks to hold Defendant JPMC liable for "the actions of Defendant Safeguard with respect to any damages to the Premises or the personal property of Plaintiff [A. Malick]" due to JPMC's knowledge of Safeguard's "previous illegal activities."  [Dkt. #48, Second Am. Compl. at ¶ 46]. As the Court has already explained, all of Plaintiffs' claims against Safeguard, including negligence, have been dismissed, since Safeguard did not commence its management of the Premises until after the damage to Plaintiffs' real and personal property had already occurred.  *See supra* at 21-24.  Accordingly, summary judgment is GRANTED as to Count XIII, and this Count is hereby DISMISSED.

D.     **Absent the Parties' Mortgage Documents the Court is Unable to Resolve the Remaining Claims And Accordingly Denies Defendant JPMC's Motion for Summary Judgment**

With respect to Counts I (conversion), V (negligence), X (Connecticut Creditors' Collection Practices Act), XI (negligence), and XV (CUTPA), the factual record is not sufficiently developed to permit this Court to assess these claims because the underlying mortgage documents appear to have been inadvertently omitted, or they are otherwise unavailable.  Absent these documents, the Court is unable to assess the following issues: (i) Plaintiff A. Malick's and Defendant JPMC's contractual rights and duties, (ii) the standard of care owed, (iii) whether or not that standard of care was breached, (iv) whether that breach actually and

proximately caused the damages Plaintiffs allege, (v) whether LPS's entrances onto the Premises were authorized, and (vi) whether and when Defendant JPMC had a right to possess the Premises.

In light of these deficiencies, the Court GRANTS Defendant JPMC leave to refile its motion for summary judgment as to these claims, and ORDERS Defendant JPMC to include in its filing the underlying mortgage documents, if they are available, and if they are not, an affidavit explaining why they are not. Defendant JPMC is further ORDERED to address each of the above issues in its renewed motion.

## IV.  Conclusion

For the foregoing reasons, the Court GRANTS Defendant Safeguard's Motion for Summary Judgment in its entirety.  The Court GRANTS in part and DENIES in part Defendant JPMC's Motion for Summary Judgment and its Motion to Strike.  Defendant JPMC is given leave to refile its summary judgment brief as to the remaining counts within 21 days of the date of this Order.  Plaintiff shall file his Opposition 14 days thereafter.  Finally, the Court DISMISSES S. Malick as a plaintiff in this action for lack of standing.

IT IS SO ORDERED, ADJUDGED AND DECREED, this 30th day of September 2015, Hartford, Connecticut.

_____/s/_____
Vanessa L. Bryant,
United States District Judge