**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ABU HASHEM W.Q. MALICK,** | : | |
| **AND SHUJATT Q. MALICK,** | : | |
| **Plaintiffs,** | : | |
| | : | **CIVIL ACTION NO.** |
| **v.** | : | **3:13-cv-00669 (VLB)** |
| | : | |
| **J.P. MORGAN CHASE BANK, N.A.** | :` | **May 16, 2016** |
| **AND SAFEGUARD** | : | |
| **PROPERTIES, LLC,** | : | |
| **Defendants.** | : | |

**MEMORANDUM OF DECISION FOLLOWING BENCH TRIAL**

Plaintiffs, Abu Hashem W.Q. Malick ("A. Malick") and Shujatt Q. Malick ("S. Malick"), bring federal constitutional and state law claims against Defendants, J.P. Morgan Chase Bank, N.A. ("JPMC") and Safeguard Properties, LLC ("Safeguard").  The Court conducted a bench trial, at which it finds the following facts were established by at least a clear preponderance of the evidence.  *See* Fed. R. Civ. P. 52(a).

**I.**   **Findings of Fact**

Plaintiff A. Malick is the owner and current resident of the premises located at 4405 Black Rock Turnpike, Fairfield, CT 06824-7832 (hereinafter "the Premises").  The Premises are located near the Merritt Parkway, a major route through the state of Connecticut, and on Route 59, a major route that runs through Easton, Connecticut.  They are also within walking distance, approximately four or five houses away, from a motel.

On or about June 25, 2007, A. Malick entered into a mortgage agreement with Washington Mutual Savings Bank (the "Mortgage").[1]  The Mortgage contained two provisions relevant to this litigation.  The first provision stated:

> Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage . . . . Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

The second provided:

> Protection of Lender's Interest in the Property and Rights Under this Security Instrument.  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under the Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property . . . . Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows . . . and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

[Pls.' Trial Ex. 8 at ¶¶ 7, 9].

---

[1] WAMU went into receivership in August 2008, and Defendant JPMC assumed the loan at issue here.

A. Malick did not make any mortgage payments after August 2008.  In November 2008, A. Malick began serving a term of incarceration, which ran through May 25, 2012.  After months of nonpayment, in early 2009, JPMC commenced foreclosure proceedings against the Premises.

The Premises were unoccupied during A. Malick's approximately three-and-a-half year term of incarceration.  A. Malick asked his brother, S. Malick, to check on the Premises.  S. Malick believed the Premises were haunted, and was reluctant to enter the house.  He occasionally drove by and conducted a curbside examination of the house.  He allowed the mail to accumulate and only collected it sporadically.  Neither of the Malicks paid the utility bills, thus, within a few months of A. Malick's incarceration, the house was without heat or electricity, and remained in this state until he was released.  No yard maintenance was performed for months, causing the grass to grow at least a foot high.  Finally, during the first winter following A. Malick's incarceration (2009), the home was never winterized.  As a result, a pipe burst, causing water to seep through the interior of the home, damaging the sheet rock and rendering the Premises uninhabitable.  In March 2011, S. Malick reported the damage to a Fairfield police officer, but he did not repair the damage or commence regular inspections or maintenance of the Premises.[2]

---

[2] At trial, S. Malick testified that the damage to the home caused by the burst pipe was limited to cosmetic damage to the home's foyer.  This self-serving testimony is belied by contemporaneous documentary evidence which Plaintiffs did not otherwise refute before or during trial.  *See* [Pls.' Trial Ex. 3 at 1 (March 25, 2011 police report noting that "the residence appeared to be [un]inhabitable due to severe water damage made on the interior sheet rock . . . Both the exterior and interior of the property was in very poor condition")].

After observing the physical deterioration of the home, Defendant JPMC hired LPS Field Services, LLC ("LPS"), now known as ServiceLink Field Services, LLC, to determine whether the Premises were occupied or whether they had been abandoned.  LPS employees monitored the occupancy status of the Premises from July 2009 through November 2010.  By the end of November 2010, LPS determined that the Premises had been abandoned.  After learning this, Defendant JPMC instructed LPS to inspect the interior and secure the Premises. Janice Seymour, a property preservation supervisor for Defendant JPMC, testified that eight days *before* LPS entered the Premises, it posted a notice on the exterior, informing Plaintiffs of Defendant JPMC's intent to inspect and secure them.  Neither S. Malick nor A. Malick responded to this notice, or otherwise informed JPMC or LPS that the Premises were not abandoned.

As a result, in December 2010, LPS changed the locks on the Premises and began its internal inspections.  From December 2010 through June 2012, LPS inspected the Premises at least once (and often multiple times) every month, taking extensive photos of the interior and exterior, and preparing detailed reports regarding the presence of occupants and personal items, whether the Premises were adequately secured upon arrival, the condition of the exterior and interior of the home, including the presence of appliances and damage to rooms, floors, and plumbing, whether or not the home was receiving utilities, and maintenance needs, such as winterizing, debris removal, changing of the locks, replacement of glass, and lawn maintenance.  *See*, e.g., [Pls.' Trial Ex. 7 at SLFS000145-148, SLFS000258-262, SLFS000398-400; Dkt. #58-3, Ex. C to Def.

JPMC's Rule 56(a)(1) Statement at SP000068-75; Dkt. #58-5, Ex. E to Def. JPMC's Rule 56(a)(1) Statement at SLFS000398-400; Dkt. #59, Exs. A-G to Pls.' Rule 56(A)(2) as to JPMC's Mot. at SLFS000133-36, SLFS000141-42, SLFS000145-56, SLFS000159-60, SLFS000175, SLFS000177, SLFS000233-55, SLFS000321-24, SLFS 326-29, SLFS000464-65, SLFS000468].  LPS hired contractors to perform maintenance tasks, such as winterizing the home, changing the locks, and lawn care.  *See* [Dkt. #59, Exs. A-D to Pls.' Rule 56(A)(2) as to JPMC's Mot. at SLFS000233-34, SLFS000624-29, SLFS000630, SLFS000632; Dkt. #58-3, Ex. C to Def. JPMC's Rule 56(a)(1) Statement at SP000068-75].

On March 25, 2011, upon observing two broken windows, that furniture had been moved, and, that the locks on the front door had been changed, S. Malick called the Fairfield police a second time.  [Pls.' Trial Ex. 3 at 1].[3]  S. Malick also saw a sign posted on the front of the house.  The sign stated: "THIS PROPERTY IS MANAGED BY CHASE," and provided telephone numbers for both JPMC and "LPS Field Services" in the event "maintenance is needed" or "IN CASE OF EMERGENCY."  [Pls.' Trial Ex. 4 at 1].  During their inspection, the Fairfield police also noticed this sign, called the phone number listed on it, and confirmed that Chase Bank, through LPS, was managing the Premises.  [Pls.' Trial Ex. 3 at 1].  Before leaving the house that day, S. Malick changed the locks

---

[3] Two weeks earlier, on March 11, 2011, S. Malick visited the Premises for the first time in months, observed through a window that property inside the home had been moved, called the Fairfield Police Department, and left the home, without ever entering, before the police arrived.  *See* [Dkt. #67, Mem. of Decision Granting and Denying Defs.' Mots. for Summ. J. at 6 (citing record evidence)].

on the Premises, but he did not repair the broken windows or do anything else to secure them or make them appear occupied.

With the home under S. Malick's locks, on April 9, 2011, the Fairfield Police returned, after receiving a call from A. Malick's neighbor.  The Police found the house unsecured in multiple ways, in deplorable condition, and likely to have been frequented by an unknown person or persons for short stays.  *See* [Dkt. #67, Mem. of Decision Granting and Denying Defs.' Mots. for Summ. J. at 10-11 (citing record evidence)].  On or around April 20, 2011, LPS conducted an interior and exterior inspection of the Premises.  [Pls.' Trial Ex. 7 at SLFS000145-148].  The report from this inspection also noted that someone had been inside, and that they broke locksets, windows, and locks, and took a refrigerator, dishwasher, beds, and dressers.  [*Id.* at SLFS000148].[4]  After this visit, LPS replaced the locks S. Malick had put on the home.

On May 15, 2011, LPS inspectors returned to the Premises.  *See* [Dkt. #59-1, Ex. E to Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at SLFS000252-55, SLFS 000464-65].  The photos taken during this visit display extensive damage, including exposed wiring and plumbing and large amounts of debris strewn about the house.  [*Id.* at SLFS000253-54].  However, some appliances and

---

[4] At trial, Plaintiffs continued to dispute the accuracy of this report, by pointing to a summary inspection sheet stating "no damage" on this date, but offered no additional evidence to rebut the specific factual findings from the full LPS report.  [Pls.' Ex. 7 at SLFS000399].  In addition, the statement "no damage" would appear to refer to the Premises themselves, and would not conflict with the observation that appliances and furnishings had been stolen.  In addition, this summary sheet noted that the house was found "unsecure," which is consistent with the broken locksets and windows noted in the LPS report.  [*Id.*].

fixtures, including an oven and sink in the kitchen, and a toilet and sink in a bathroom, are visible.  [*Id.* at SLFS000253-54].  In addition, LPS re-secured the Premises and placed on them a sign indicating that they were secure.  [*Id.* at SLFS000252].

Approximately two weeks later, LPS inspectors returned to the Premises and determined the house had sustained a minimum of $10,000 in damage due to vandalism, including the theft of the stove/range and copper baseboard.  [*Id.* at SLFS000149; Pls.' Trial Ex. 7 at SLFS000399].  After this determination, LPS inspectors returned to the Premieses on numerous occasions to check whether they were secure, and to replace broken glass, cut the grass, and install boards and screens.  Despite these efforts, the Premises continued to suffer damage throughout the months of June and July, by which point, all appliances and copper piping had been stolen, and the walls, ceiling, heating system, and plumbing sustained significant damage.  [Pls.' Trial Ex. 7 at SLFS000399].

Defendant JPMC contends, and Plaintiffs do not deny, that during the period of A. Malick's incarceration, numerous individuals were aware of the nature and extent of his absence from the Premises, including friends, relatives, members of his religious community, and law enforcement.  They were also aware that the house was uninhabited.  In addition, by July 2011, Defendant JPMC had already spent approximately $3,065.75 on services to maintain the Premises. [Dkt. #59-1, Ex. E to Pls.' Rule 56(a)(2) Statement as to JPMC's Mot. at SLFS000464].  This amount was on top of the fees JPMC paid LPS to monitor the Premises.  However, JPMC appears not to have insured the Premises.

On October 20, 2011, S. Malick returned to the Premises and called the police when he noticed that the back door and two windows were open.  [Pls.' Trial Ex. 1 at 1].  After surveying the damage, S. Malick locked the door and left the Premises.  He did not change the locks at that time or at any time thereafter, but he was able to access the interior of the home through an open window.  Nevertheless, his visits remained infrequent, as evidenced by a police report dated November 17, 2011, which stated that the "last time [S.] Malick checked on his brother's residence w[a]s sometime in May [2011]."  [Pls.' Trial Ex. 2 at 1].

A. Malick was released from prison on May 25, 2012.  Upon his release, he returned to the Premises.  That same day, A. Malick had the locks put on by LPS changed.  The locks remained in Plaintiffs' control thereafter.  On or around July 10, 2012, Defendant Safeguard received its first order to inspect the Premises. [Dkt. #56-7 Meyer Aff. at ¶ 6; Dkt. #56-8, Ex. A to Meyer Aff. at SP000052].  On August 19, 2012, Safeguard placed a sticker on the front door of the Premises stating that it determined the Premises were vacant.  Ten days later, on August 29, 2012, A. Malick informed Safeguard by letter that he was living in the home and that it was neither vacant nor abandoned.  [Pls.' Trial Ex. 9 at 1-2].  Between August 30, 2012 and March 9, 2013, Safeguard conducted several additional inspections of the exterior of the home.  [Dkt. #56-7, Meyer Aff. at ¶ 9].  Each time, Safeguard's contractor reported that the Premises were occupied.  [*Id.*].

On April 11, 2013, Safeguard first reported to Defendant JPMC that the Premises were vacant.  [*Id.* at ¶ 10].  Four days later, on April 15, 2013, Defendant JPMC sent A. Malick a letter notifying him of Safeguard's determination and

**8**

asking him to confirm whether he was maintaining the Premises and to provide their current occupancy status.  [Pls.' Trial Ex. 13 at 1].  One week later, on April 22, 2013, A. Malick sent a response, advising JPMC that the property was not vacant.  [Pls.' Trial Ex. 12 at 1].  Over a month later, on May 24 and May 26, 2013, JPMC sent A. Malick letters informing him that it was notified the Premises were vacant and asking him to confirm whether they were vacant.  [Pls.' Trial Exs. 10-11].

After not receiving a response, on June 9, 2013, a Safeguard inspector came to the Premises, informed A. Malick that he planned to inspect the Premises, and A. Malick reported that they were occupied and ordered him to leave, which he did.  Two weeks later, on June 23, 2013, two Safeguard employees returned to the Premises with tools and stated that they had come to change the locks because they had understood the Premises were vacant.  A. Malick informed them that he lived there, ordered them off the Premises, and they left without changing the locks.  Finally, at some time thereafter, Safeguard employees placed another vacancy sticker on the Premises when A. Malick was away.

A. Malick claims that these three visits from Safeguard and the three letters from JPMC left him emotionally distraught because he could not be certain that these events would not occur again or that he would retain control of the Premises if he left them for any length of time.  However, he does not contend that the Safeguard employees used force to enter the Premises, held or detained the Premises, damaged any real or personal property during any of these

entrances, or required him to cause damage to the Premises or commit a breach of the peace in order to regain possession of the Premises.  In addition, A. Malick engaged in international travel for weeks at a time on three occasions after he had returned to the Premises, including after the Safeguard intrusions had occurred.  Finally, A. Malick claims to have spent thousands of dollars repairing the Premises years ago and over an extended period of time, however, he has offered no credible admissible evidence of his claim.  He has no receipts for labor or materials and can only estimate the amount he allegedly spent and the dates on which he spent money to repair the Premises.  He did not hire licensed contractors, although he claims to have had plumbing and electrical work done, which could only be done legally by a licensed contractor.  In light of his poor memory, interest in the outcome, general demeanor while testifying, and lack of any admissible evidence beyond his incredulous and self-serving testimony to support his claim of damages, the Court finds that A. Malick has failed to prove that he suffered any particular amount of monetary damages.  On the other hand, the Court does find that the Premises suffered damages, as evidenced by photos and other evidence offered by the parties.

II.   **Analysis**

A.   **After Hearing Evidence Plaintiffs' Remaining Claims Must be Dismissed**

    1.   **Count I Must Be Dismissed Because Plaintiffs Failed to Put Forth Evidence that JPMC Converted A. Malick's Personal Property.**

Conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights." ***Aetna Life & Cas. Co. v. Union Trust Co.***, 230 Conn. 779, 790, 646 A.2d

799, 804 (Conn. 1994) (citations omitted).  To establish a claim of conversion, a plaintiff must prove that: "(1) the material at issue belonged to the [plaintiff], (2) that [the defendant's act] deprived the [plaintiff] of that material for an indefinite period of time, (3) that [the defendant's] conduct was unauthorized and (4) that [the defendant's] conduct harmed the [plaintiff]."  *News Am. Mrktg. In–Store, Inc. v. Marquis*, 86 Conn. App. 527, 545, 862 A.2d 837, 848 (Conn. App. Ct. 2004).

Plaintiffs offer two theories of conversion: (i) Defendant JPMC directly, or through its agent, LPS, took Plaintiff A. Malick's personal property during the period that they were managing the Premises, and (ii) by changing the locks and taking possession of the Premises, Defendant JPMC prevented S. Malick from adequately protecting the personal property, thereby causing the property to be converted.  Given the factual record, neither of these theories succeeds.

Plaintiffs' first theory fails.  The Defendant all but concedes that the material at issue belonged to A. Malick, but contests his claim that its conduct deprived him of his personal property.  A. Malick presented no evidence that anyone acting on behalf, at the behest of, or under color of license from either JPMC or LPS took A. Malick's personal property, and thus the Court never reaches the question of whether their conduct was authorized or harmful.  The only evidence Plaintiffs offered at trial—which Plaintiffs' counsel characterized as purely "circumstantial"—was that JPMC did not have an insurance policy on the Premises, Plaintiffs were in default on their mortgage and had permitted the home to fall into disrepair, that JPMC and LPS knew that A. Malick was away from the Premises, and that they were able to access the Premises.  Given Plaintiffs' lack

of diligence in monitoring the Premises, that the Premises are located near major roads and businesses, that Plaintiffs abandoned the Premises and permitted them to fall into utter disrepair long before JPMC and LPS began to manage the Premises, and that many people unaffiliated with JPMC and LPS also were aware that A. Malick was away in prison, the evidence put forth by Plaintiffs is insufficient to prove by a preponderance of the evidence that either Defendant JPMC or its agent LPS took the property.

Plaintiffs' second conversion theory fails because under the terms of the Mortgage, LPS was authorized to enter onto and secure the Premises by, among other things, changing the locks.  The Mortgage provides that:

> If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under the Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property . . . . Securing the Property includes, but is not limited to, entering the Property to make repairs, <u>change locks</u>, replace or board up doors and windows, have utilities turned on or off.

[Pls.' Trial Ex. 8 at ¶ 9].

Plaintiffs vigorously contest Defendant JPMC's assertion that the Premises were abandoned during the period A. Malick's personal property was taken, principally, by pointing to the facts that S. Malick twice removed and replaced the locks LPS put on the Premises and that A. Malick contested Defendant JPMC's efforts to foreclose on the property.  *See* [Dkt. #95, Pls.' Post-trial Br. at 3]. However, the record in this case overwhelmingly supports a finding of abandonment.  Among the relevant facts are those establishing that: (i) A. Malick

was absent from the Premises for nearly two-and-a-half years, during which time his personal property was taken; (ii) in his absence, S. Malick performed virtually no maintenance work on the Premises and rarely visited it; (iii) S. Malick entered the home less than five times during this period, out of fear that it was haunted; and (iv) during this time the Premises suffered extensive water damage from a burst pipe, sustained numerous broken windows, were covered in debris, and were surrounded by an overgrown yard, with the grass reaching at least a foot high.  *See Quinto v. Boccanfusco*, 139 Conn. App. 129, 134, 54 A.3d 1069, 1073 (Conn. App. Ct. 2012) (finding "claims of actual possession to be not credible considering the deplorable condition of the premises" which included the presence of "debris, useless equipment, broken furniture and junk automobiles").[5]

---

[5] In their post-trial brief, Plaintiffs assert that "more evidence is necessary to determine whether property is abandoned."  [Dkt. #95, Pls.' Post-trial Br. at 5].  In support, Plaintiffs cite Connecticut statutes concerning commercial real property, the standard necessary for simultaneous filings of motions for judgment of foreclosure and for default for failure to appear, and landlord-tenant relationships.  *See* [*id.* (citing Conn. Gen. Stat. §§ 8-291 (defining "abandoned property" for commercial zoning purposes), 49-31s (standard for simultaneous filings of motions for judgment of foreclosure and for default for failure to appear), 47a-11b (defining "abandonment" for the purposes of a landlord's remedies against a tenant who abandons a property unit))].  None of these are apposite.  Moreover, the two-and-a-half year period in which Plaintiffs permitted the home to deteriorate and sit unoccupied is easily sufficient to evince "an intention to abandon or relinquish accompanied by some act or omission to act by which such an intention is manifested."  *R.F. Daddario & Sons, Inc. v. Shelansky*, 123 Conn. App. 725, 735, 3 A.3d 957, 964 (Conn. App. Ct. 2010).  As the evidence overwhelmingly establishes that Plaintiffs abandoned the property, Count V of the Second Amended Complaint, which contends that Defendant Chase prevented the Plaintiffs from protecting and preserving the Premises and the property contained therein, also must be dismissed.

Moreover, even if Plaintiffs had not technically abandoned the Premises, JPMC still retained authority to enter and change the locks because it is undisputed that Plaintiffs allowed the Premises to deteriorate during this time. Among the covenants contained in the Mortgage was an agreement that A. Malick would not permit the Premises to deteriorate.  [Pls.' Trial Ex. 8 at ¶ 7]. Elsewhere, the Mortgage stated that violation of any of the covenants or agreements in the Mortgage triggered JPMC's right to enter and protect its interest in the Premises.  [*Id.* at ¶ 9].  Plaintiffs' contentions to the contrary fail.

Plaintiffs first assert that LPS' entrances and changing of the locks were not authorized by the Mortgage because they were neither reasonable nor appropriate.  [Dkt. #95, Pls.' Post-trial Br. at 6].  However, the relevant Mortgage provision specifically references entering the Premises and changing the locks. [Pls.' Trial Ex. 8 at ¶ 9 ("Securing the Property includes, but is not limited to entering the Property to  . . . change locks . . . .")].  That these efforts were ultimately insufficient to protect A. Malick's personal property does not render them unreasonable or unauthorized under the Mortgage agreement.  Essentially, Plaintiffs' argument is that LPS should have done *more*; *not* that it lacked the authority to take the actions that it did under the Mortgage.

Plaintiffs' reliance on a general notice provision in the Mortgage to challenge LPS' authority to enter and change the locks on the Premises is also misplaced.  [Dkt. #95, Pls.' Post-trial Br. at 3-4].  Nowhere does this provision state that failure to provide sufficient notice transforms an otherwise authorized act into an unauthorized act.  *See* [Pls.' Trial Ex. 8 at ¶ 15].  Furthermore the

Malicks admit that S. Malick was not collecting the mail delivered to the Premises on a regular basis, and therefore, Plaintiffs cannot establish that notice was not given. Indeed, the record reflects that it was JPMC's unsuccessful attempts to contact Plaintiff A. Malick to ascertain whether the Premises were abandoned which led JPMC to take actions designed to secure them.

Finally, none of the Connecticut statutory and common law Plaintiffs cite in their post-trial brief renders JPMC's conduct unauthorized. *See* [Dkt. #95, Pls.' Post-trial Br. at 4]. JPMC did not demand possession of the Premises, nor did it seek to eject Plaintiffs (or Plaintiffs' personal property) or extinguish their possessory interests. JPMC simply exercised its contractual right to enter and protect *its* interest in the property. Thus, the cases and statutes Plaintiffs rely upon concerning a mortgagor's retention of its right to possession of the property during foreclosure and the remedy of ejectment do not support their claim that JPMC was prevented by law from exercising its contractual rights.

Similarly unpersuasive are Plaintiffs' citations to two Town of Fairfield Ordinances. *See* [*id.* at 5-6]. The Blight Prevention and Unfit Property and Structures Ordinances are intended to protect the *public* from structures left in disrepair, not the legal and financial interests of owners of these properties. *See* Code of Town of Fairfield §§ 51-1A. (stating that the Blight Prevention Ordinance was enacted pursuant to Conn. Gen. Stat. § 7-1487(H) which concerns public health and safety); 100-1B. (declaring that purpose of Unfit Properties and Structures "article is to protect, preserve and promote the physical and mental health and social well-being of the people . . . ."). Plaintiffs cite no authority

requiring Defendant JPMC to wait until the Premises posed a public health risk before seeking relief, nor would such a rule make sense.[6]

Accordingly, LPS' entry upon and changing the locks on the Premises were authorized, and Count I is hereby DISMISSED.

2. <u>Count X Must Be Dismissed Because Defendant JPMC Was Contractually Permitted to Enter onto the Premises and its Conduct was Reasonable</u>

Plaintiffs also contend that Defendant JPMC engaged in "abusive, harassing, deceptive or misleading debt collection practices" in violation of the Connecticut Consumer Protection Act, Conn. Gen. Stat. § 36a-646 (the "CCPA") and certain regulations promulgated under that statute, Conn. Agencies Regs. §§ 36a-647-5 and 36a-647-6.  [Dkt. #48, Second Am. Compl. at ¶ 43].  Plaintiffs claim fails for at least two reasons.  First, the conduct undertaken by Defendant JPMC, including changing the locks, putting vacancy notices on the property, and sending letters to A. Malick to confirm whether or not the property was abandoned, was contemplated under the mortgage agreement.  *See, e.g., Bank of New York Mellon v. Worth*, No. 3:13-cv-1489 (MPS), 2016 WL 1048742, at *10 (D. Conn. Mar. 14, 2016) (granting summary judgment on CCPA claim where complained of actions, including "entering onto the property to assess its value and leaving a notice on the front door" were "contemplated by the mortgage

---

[6] Plaintiffs also, inexplicably, invoke the notice provision of the Mortgage in connection with Defendant Chase's determination that the Premises had been abandoned.  [Dkt. #95, Pls.' Post-trial Br. at 3].  Once again, Plaintiffs bear the burden of proof on their claims and set forth no evidence that notices were not sent.  Given that Plaintiffs were away from the home for long periods of time, it would be difficult, if not impossible, for them to know whether such notices were ever delivered.

agreement").  Second, in light of S. Malick's neglect of the Premises, the deterioration of the extensive Premises throughout the relevant period, and A. Malick's extended absences from them, even after he returned from prison, Safeguard's repeated notices and visits and Defendant JPMC's requests confirming whether or not the property was abandoned were reasonable, and could not be considered or reasonably perceived as abusive, harassing, fraudulent, or misleading.

### 3. Count XI Asserting Negligence Must be Dismissed Because Plaintiffs Have Failed to Establish Defendant JPMC Breached a Duty it Owed Plaintiffs

Plaintiffs assert that Defendant JPMC engaged in vandalism and the destruction of property at the Premises, or, alternatively, negligently permitted others to commit such acts.  [Dkt. #48, Second Am. Compl. at ¶ 44].  Plaintiffs' initial claim, that Defendant JPMC destroyed the Premises and their contents is a non-starter, as they have not set forth sufficient concrete evidence in support of this allegation, but instead offer mere speculation.  The only fact the Plaintiffs offer in support of this claim is that JPMC's agents entered the Premises.  The inference that JPMC's agents must have done it is not reasonable in light of all of the evidence.  The absence of any direct evidence that they did, coupled with the duration of A. Malick's abandonment and S. Malick's neglect of the Premises, their unkempt appearance, and their locale dispel the inference that JPMC or its agents were directly responsible for the damage.

Plaintiffs' negligence claim also fails because they fail to identify any duty Defendant JPMC owed them, which it breached.  As for duty, Plaintiffs point to

language in Paragraph 9 of the Mortgage, which states: "If . . . (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect the Lender's interest in the Property . . . ."  [Pls.' Trial Ex. 8 at ¶ 9; Dkt. #95, Pls.' Post-trial Br. at 3].  Plaintiffs misconstrue this provision as imposing a duty on Defendant JPMC (the lender) to act reasonably with respect to Plaintiffs (the borrowers).  This provision is permissive, not mandatory.  The plain language of this section of Paragraph 9, particularly the clause immediately following "reasonable or appropriate," namely, "*to protect the Lender's* interest in the Property" makes clear that this provision is intended to bestow upon Defendant JPMC the right to do what it believes is reasonable or appropriate to protect its interest in the Premises.  [Pls.' Trial Ex. 8 at ¶ 9 (emphasis added)].  Indeed, the title of this paragraph of the Mortgage reads, "Protection of Lender's Interest in the Property and Rights Under this Security Instrument."  [*Id.*].

In addition, Plaintiffs have not set forth any evidence to show that Defendant JPMC failed to act reasonably to protect the property.  Through its agents LPS and Safeguard, Defendant JPMC monitored the property, undertook repairs, winterized it, and put on and checked the locks.  In response, Plaintiffs offer only the fact that the Premises were ultimately accessed and severely damaged by unknown third parties at unknown times, and that Defendant Chase never chose to install an alarm system.  *See* [Dkt. #95, Pls.' Post-trial Br. at 6].  That additional measures to secure the property *could* have been taken does not establish that the Defendant was negligent in not taking them.  Plaintiffs simply offer no basis, other than the damage itself and the absence of an alarm system,

to show that Defendant JPMC was negligent in not installing one.  Moreover,

given the extent of the damage and Plaintiffs' chronic absence from the Premises

during the time the damage and theft occurred, it is doubtful that an alarm system

would have limited or prevented the damage, and thus, that its absence directly

and proximately caused the damage.

### 4. Count XV Asserting a Claim under CUTPA Must be Dismissed Because Defendant JPMC and its Agents Did Not Engage in Unfair or Deceptive Practices Nor Did They Cause Plaintiffs to Suffer an Ascertainable Loss

CUTPA provides that "[n]o person shall engage in unfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade

or commerce."  Conn. Gen. Stat. § 32-110b(1).

> To determine whether conduct is unfair under CUTPA, Connecticut courts apply the cigarette rule and look to '(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, is it within at least the penumbra of common law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . .'

*Richards v. Direct Energy Servs., LLC*, 120 F. Supp. 3d 148, 158 (D. Conn.

2015) (quoting *Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 227-28, 990

A.2d 326 (Conn. 2010)).  "A practice need not meet all three criteria to constitute

an unfair practice under CUTPA, and '[a] practice may be unfair because of the

degree to which it meets one of the criteria or because to a lesser extent it meets

all three.'"  *Id.* (quoting *Naples*, 295 Conn. at 227-28).  "[A] CUTPA claim need not

be predicated upon a breach of contract."  *Id.* (quoting *Complete Energy, Inc. v.*

*Fox*, No. TTDCV116004252S, 2013 WL 812483, at *3 (Conn. Super. Ct. Jan. 25,

2013)).  However, where, as here, the parties do have a contractual relationship, "the lack of a breach of contract may be probative of whether the defendant's practice was unfair."  *Id.* (citing *Edmands v. CUNO, Inc.*, 277 Conn. 425, 450-51, 892 A.2d 938 (Conn. 2006)).

"A subset of unfair practices, recognized by [the Connecticut] Supreme Court, is deceptive practices."  *Wilkins v. Yale Univ.*, No. CV 106014646S, 2011 WL 1087144, at *4 (Conn. Super. Ct. Feb. 25, 2011) (citing *Daddona v. Liberty Mobile Home Sales, Inc.*, 209 Conn. 243, 254, 550 A.2d 1061 (Conn. 1988)).  "An act or practice is deceptive if three conditions are met.  First, there must be a representation, omission, or other practice likely to mislead customers.  Second, consumers must interpret the message reasonably under the circumstances.  Third, the misleading representation, omission, or practice must be material-that is, likely to affect consumer decisions or conduct."  *Bank of New York v. Nat'l Funding*, No. X01CV000171525S, 2005 WL 527749, at *5 (Conn. Super. Ct. Jan. 21, 2005) (citing *Southington Sav. Bank v. Rodgers*, 40 Conn. App. 2d 23, 28, 668 A.2d 773 (Conn. App. Ct. 1995)).  Under CUTPA, deceptive acts include "a broader range of conduct than common-law claims for fraud or misrepresentation and does not require proof of intent."  *Richards*, 120 F. Supp. 3d at 158 (citing *Wilkins*, 2011 WL 1087144, at *4)).

Neither the changing of the locks when the Premises lay unoccupied for years nor the conduct by Safeguard following A. Malick's return violated CUTPA.  Defendant JPMC had the locks changed after reasonably concluding that the property had been abandoned, and in order to protect its interest in the Premises,

as permitted by the Mortgage agreement.  *See Haslam-James v. Lawrence*, 133 Conn. App. 321, 330-32, 35 A.3d 368 (Conn. App. Ct. 2012) (affirming trial court dismissal of CUTPA claim based on defendant's changing of the locks prior to tenant's stipulated departure date, despite finding for plaintiff on a separate entry and detainer claim, upon determining that defendant acted in good faith and "pursuant to a reasonable, albeit mistaken, belief that the plaintiff had vacated fully the premises approximately five days earlier than the parties' stipulation required").  Also, as noted above, in light of the deterioration of the property throughout the relevant period, and A. Malick's extended travel away from it even after he returned from prison, Safeguard's repeated notices and visits and Defendant JPMC's requests confirming whether or not the property was abandoned were reasonable, and neither unfair nor deceptive.  *See Worth*, 2016 WL 1048742, at *9 (dismissing CUTPA counterclaim grounded, in part, on defendant's entrance and placement of a vacancy notice upon her property).

Finally, even if Plaintiffs had established that any or all of the conduct undertaken by Defendant JPMC and its agents to monitor and secure the property was unfair or deceptive, their CUTPA claim still fails because they have not put forth any evidence that this conduct caused them to suffer an ascertainable loss. *See* Conn. Gen. Stat. § 42-110g(a) (providing for CUTPA action where person "suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act, or practice prohibited by section 42-110b . . . ."); *Neighborhood Builders, Inc. v. Town of Madison*, 294 Conn. 651, 657, 986 A.2d 278 (Conn. 2010) ("[T]o be entitled to any relief under CUTPA, a plaintiff

must first prove that he has suffered an ascertainable loss due to a CUTPA violation.") (citations and quotations omitted).  As discussed, the changing of the locks and maintenance of the property in the absence of both Plaintiffs did not cause the damage to and theft of the Plaintiffs' real and personal property.  At most, this and their post-damage conduct caused Plaintiffs emotional distress, which "'does not constitute an ascertainable loss of money or property for purposes of CUTPA.'"  *Larobina v. Wells Fargo Bank, N.A.*, No. 3:10-cv-01279 (MPS), 2014 WL 34159534, at *2 (D. Conn. Jul. 10, 2014) (quoting *Di Teresi v. Stamford Health Sys., Inc.*, 149 Conn. App. 502, 510-12, 88 A.3d 1280 (Conn. App. Ct. 2014)).

III.    <u>Conclusion</u>

For the foregoing reasons, judgment must enter in favor of Defendant JPMC on all remaining claims.  The Amended Complaint is DISMISSED.  The Clerk is directed to close this file.


                                        IT IS SO ORDERED.

                                        _____/s/_____

                                        Hon. Vanessa L. Bryant
                                        United States District Judge

Dated at Hartford, Connecticut: May 16, 2016.